# UNITED STATES DISTRICT COURT
# DISTRICT OF MINNESOTA

Peter Weesner,

                     Plaintiffs,

                                    Civ. No. 10-2164 (RHK/LIB)
                                    **AMENDED MEMORANDUM**
                                    **OPINION AND ORDER**

v.

U.S. Bancorp d/b/a U.S. Bank,

                     Defendant.

Nicholas G.B. May, David H. Redden, Fabian, May & Anderson, PLLP, Minneapolis, Minnesota, for Plaintiff.

Sara Gullickson McGrane, Jessica M. Marsh, Ryan A. Olson, Felhaber, Larson, Fenlon & Vogt, P.A., Minneapolis, Minnesota, for Defendant.

## INTRODUCTION

     Plaintiff Peter Weesner formerly worked for Defendant U.S. Bancorp d/b/a U.S. Bank ("U.S. Bank"); his employment was terminated in August 2009.   In this action, he alleges that U.S. Bank discriminated on account of his mental disabilities in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the Minnesota Human Rights Act ("MHRA"), Minn. Stat. § 363A.01 *et seq.*, and retaliated against him by terminating his employment after he complained of the alleged discrimination.   U.S. Bank now moves for summary judgment.   For the reasons set forth below, the Court will grant its Motion.

# BACKGROUND

Viewed in the light most favorable to Weesner, see Graves v. Ark. Dep't of Fin. & Admin., 229 F.3d 721, 723 (8th Cir. 2000), the record reveals the following.   U.S. Bank hired Weesner in 1999 as an "Account Specialist III" in its "DDA Fraud Division." (Weesner Dep. at 99.)   Although the exact nature of this position is unclear from the record, it appears that he provided computer support in connection with suspected fraud in U.S. Bank's customers' checking accounts.   (Macdonald Dep. at 10.)   He was promoted to "project analyst" five months after being hired, a position that later became known as "PC support specialist I."   (Weesner Dep. at 99-100.)   In 2007, he was promoted to the position "PC support specialist II," a position he held until the termination of his employment.   (Id. at 56, 100.)   Initially, Weesner's supervisor was Norma Macdonald, but when she was promoted in 2008 his supervisor became Todd Criego, who reported to Macdonald.   Macdonald's supervisor, in turn, was Leslie Ragan, U.S. Bank's manager of deposit fraud prevention services, and Ragan reported to Glen Ulrich, U.S. Bank's operations manager.   (Macdonald Dep. at 10-12; Ragan Dep. at 6-7; Ulrich Dep. at 5.)

Weesner was diagnosed with paranoid schizophrenia in 1996 and with sleep apnea in 2003, although he had been suffering symptoms of the latter condition since 1999. (Weesner Dep. at 42-43, 89.)[1]   The sleep apnea made it difficult for him to stay asleep at

---

[1]  Schizophrenia is a "common type of psychosis[] characterized by abnormalities in perception, content of thought, and thought processes (hallucinations and delusions) and by extensive withdrawal of interest from other people and the outside world, with excessive focusing on one's own mental life."   Stedman's Medical Dictionary 1600-01 (27th ed. 2000).   Paranoid schizophrenia is a type of schizophrenia "characterized predominantly by delusions of persecution and megalomania."   Id. at 1601.   Sleep apnea refers to an interruption of breathing during sleep

night and often left him feeling tired and groggy during the day.   (Id. at 43-44.)   The

schizophrenia impeded his ability to communicate and led to confusion when he was

exposed to "intense stimuli," including stressful situations such as "heightened,"

"agitated," "heated," or "escalating" conversations.   (Id. at 143-44, 160-61, 231.)   In such

situations, Weesner would reduce the stimuli by "blocking out" sights and sounds, in order

to return "to a better state of mind."   (Id. at 144, 231.)   Nevertheless, medication "fairly

well controlled" the schizophrenia symptoms.   (Id. at 96-99.)

Weesner disclosed his sleep apnea to U.S. Bank after his physician first diagnosed it

in 2003.   (Weesner Dep. Ex. 15.)   In response, the company took several steps to

accommodate the condition, including permitting him to come to work late and taking

intermittent leave.   (Id. at 129-32, 136.)   However, he did not initially inform U.S. Bank

of his schizophrenia because he did not want his co-workers to know that he suffered from

the condition.   (Id. at 75-77.)

Throughout his employment, Weesner received generally favorable performance

reviews.   He did, however, have some problems communicating with his superiors and

co-workers.   His 2004 review, for example, noted "difficulties with . . . his

communication style," which was "perceived by others . . . as being aloof and/or

pretentious."   (Weesner Dep. Ex. 7.)   His 2006 review echoed those concerns, as did his

later reviews.   (Id. Exs. 8, 10.)   Weesner acknowledged in his deposition that his

co-workers may have viewed him as argumentative.   (Id. at 92.)

In December 2007, Macdonald was giving instructions to another employee when

"due to temporary obstruction of the airway."   Id. at 111.

Weesner interrupted the conversation and disagreed with those instructions.   (Macdonald

Dep. at 23.)   Macdonald then spoke with Weesner separately about the situation and the

conversation became "elevated," with Macdonald raising her voice.   (Id. at 24; Weesner

Dep. at 112.)   According to Weesner, the conversation "triggered" his schizophrenia,

resulting in him "turning away" from Macdonald.   (Weesner Dep. Ex. 14.)   Macdonald

perceived this as "dismissive" and "very rude" and reported it to Kim Yoch, a U.S. Bank

HR employee.   (Macdonald Dep. at 24; Yoch Dep. at 33.)   After speaking with Ragan,

Macdonald issued Weesner a written warning.   (Weesner Dep. Ex. 13; Yoch Dep. at 35;

Macdonald Dep. at 24-25.)   Weesner submitted a response asserting that he had not been

insubordinate and contending that if a manager "gets loud or yells at me I will end a

conversation [because] I have the right to be treated in a professional and courteous

manner."   (Weesner Dep. Ex. 14.)   He also indicated that, in the future, "if an exchange

has become unprofessional, I will request the immediate intervention of HR."   (Id.)

Yoch and Ragan met with Weesner after receiving his written response.   (Yoch

Dep. at 41 & Ex. 27.)   Weesner demanded that Yoch investigate the incident and

interview witnesses who would (allegedly) corroborate his version of events.   (Yoch Dep.

at 38 & Ex. 27.)   After speaking with Macdonald and Weesner, however, Yoch concluded

that both had likely raised their voices on the date in question and she did not believe any

additional investigation was warranted.   (Id. at 40.)

In July 2008, Weesner went to Yoch's office regarding concerns about Macdonald's

management of his sleep apnea.   (Weesner Dep. at 50-51.)   Yoch told him that it was

disruptive for him to come to her office unannounced and that it was "difficult to deal with

[him]."   (Id. at 52, 55.)   Based on this conversation and Yoch's prior "refusal" to

investigate the December 2007 incident with Macdonald, Weesner concluded that she was

"biased" against him.   (Id. at 117, 128.)[2]

On September 8, 2008, Weesner met with Anthonsen and informed her that he

suffered from paranoid schizophrenia, but did not want others in his department to know

about his condition.   (Weesner Dep. at 76, 116-17, 243.)[3]   He complained about the

December 2007 warning, asserting that the incident resulted from his condition and his

inability to communicate when yelled at.   (Id. at 118-19.)   He also asserted that Yoch was

"biased," as evidenced by her failure to investigate the December 2007 matter and helping

to "orchestrate" the written warning.   (May Aff. Ex. 20.)   Anthonsen told him she would

look into the warning, but there is some dispute whether that actually occurred.[4]   She also

suggested that, in the future, "should a situation occur where voices are raised in a public

setting . . . the meeting [should] be moved to a private area for discussion.   I indicated that

---

[2] In his brief, Weesner asserts that Yoch was biased against him due to "disabilities."   (Mem. in Opp'n at 9.)   There is no dispute, however, that Yoch was unaware of Weesner's schizophrenia as of July 2008.

[3] Anthonsen denies that Weesner ever informed her that he suffers from paranoid schizophrenia, and *none* of the documents submitted with the parties' Motion papers – such as the bevy of e-mails between the relevant individuals and notes from Weesner's physician – mentions the term "paranoid schizophrenia" or "schizophrenia."   Of particular note, Anthonsen received a letter from Weesner's physician, dated October 10, 2008, in support of his request for intermittent FMLA leave, which disclosed that Weesner "has a chronic psychiatric condition" without providing any additional detail.   (Weesner Dep. Ex. 19.)   Doubtful though it may be, the Court accepts as true, as it must, Weesner's assertion that he told Anthonsen about his paranoid schizophrenia in September 2008.

[4] Anthonsen testified that she met with Yoch, reviewed the written warning, and spoke with Criego regarding the incident.   (Anthonsen Dep. at 34-36.)   Criego, however, denied speaking with anyone about the incident after it occurred.   (Criego Dep. at 26.)   In the end, the warning was not removed from Weesner's file.   (Weesner Dep. Ex. 32.)

coming to HR was an option if no private rooms are available." (Id.) Weesner

understood this to be an accommodation for his condition. (Weesner Dep. at 119.)

On September 24, 2008, Criego (who by then had been promoted to Weesner's

supervisor) had a "heated" work-related discussion with Weesner. (Weesner Dep. at 143,

243.) Weesner told Criego that the meeting should be continued in HR, which Criego

found "inappropriate." (Id. at 145-46; Criego Dep. at 35.) Nevertheless, they eventually

continued their conversation in HR, with Yoch present; she "managed to keep the tone of

the conversation civil." (Mem. in Opp'n at 12; see Weesner Dep. at 145-47; Yoch Dep. at

61-63.) Criego and Weesner resolved their differences and left the meeting after shaking

hands. (Yoch Dep. at 63; Weesner Dep. at 145-46.)

Meanwhile, U.S. Bank continued to observe issues with Weesner's communication

skills. On August 12, 2008, an employee complained to his manager about the manner in

which Weesner had spoken to him. (Weesner Dep. Ex. 42.) The manager e-mailed

Macdonald, asking her to "talk to Peter about" becoming "frustrated with employees who

are . . . trying to explain their issue or . . . simply do not understand what [Weesner] is

asking of them," noting that he "needs to show a little bit more professionalism." (Id.)

On June 16, 2009, Criego was informed that Weesner had used an unprofessional tone of

voice and "look" in a conversation with a co-worker, and he counseled Weesner that

"comments need to be watched on how they are delivered." (Yoch Dep. Ex. 30.)

Weesner's 2009 review indicated that he needed to "[c]ontinue to improve [his]

communication skills" and work harder to "create positive relations with [his]

co[-]workers." (Weesner Dep. Ex. 10.)

On August 4, 2009, Criego met with Weesner to discuss these communication issues.   (Weesner Dep. Ex. 20; Criego Dep. at 36.)   Criego brought notes to the meeting; when Weesner turned the notes to look at them, Criego angrily stated, "that's my paperwork."   (Weesner Dep. at 160.)   Weesner then became concerned that Criego's "agitation and elevated anger" would trigger his schizophrenia and cause him "to kind of shut down and not be able to participate and get confused," so he asked Criego to go to HR. (Id. at 161.)   Criego told Weesner he saw no need to go to HR, but Weesner left the room and headed there anyway, with Criego following behind.   (Id.; Criego Dep. at 36-37.) Yoch was unavailable when they arrived, but they met with her later that day, with Ragan participating by telephone.   (Weesner Dep. at 161-62; Criego Dep. at 38-39.)   Weesner acknowledged that Criego had not been yelling but felt he was "unprofessional" in his tone of voice.   (May Aff. Ex. 23 at 34-35.)[5]   Ragan informed Weesner that she did not believe it was necessary for the conversation to have moved to HR and that he was probably viewing "unprofessional" conduct differently than her, Criego, and Yoch.   (Id. at 36.) She told Weesner that a "manager and an employee should have an opportunity to have an open two-way dialogue where one or both parties disagree . . . without having [the] employee get up or – and/or invite the manager to go to HR and then get up and walk out." (Id. at 34.)

On August 12, 2009, Criego issued Weesner a written warning regarding the events

---

[5] Exhibit 23 is a transcript of the conversation between Weesner, Criego, Yoch, and Ragan, produced from a surreptitious recording of the conversation made by Weesner.   In Minnesota, it is lawful for one party to a conversation to record it without the consent of the other parties.   See Minn. Stat. § 626A.02, subd. 2(d).

of August 4, among other things.   (Weesner Dep. Ex. 20.)[6]   The warning noted that the

August 4 incident "was the second time you initiated action to end a discussion during a

one on one discussion between you and your Manager" and that Weesner's "elevated voice

tone, agitated non-verbal behavior, and speaking over [Criego] was viewed as disrespectful

and unprofessional in nature."   (Id.)   Weesner, disagreeing with the warning, submitted a

written response on August 18, disputing Criego's version of events and asserting that he

had the "basic human right to end participation in [an] unprofessional exchange."   (Id. Ex.

21.)   He asked for clarification why he "ke[pt] getting written warnings for doing just as

Cathy Anthonsen instructed."   (Id.)   He then expressed "concern[] that [U.S. Bank] and

[its] Managers have made discriminatory comments about my disabilities" and "do not

have regard for equal treatment I should be entitled to under EEO."   (Id.)   He closed by

stating:

> Over 1 year ago my doctor . . . provided you with a medical certification for
> FMLA time.   U.S. Bank has been advised (for more than a year now) that I
> do have a chronic, serious and if left untreated [] disabling brain disease.
> My treatment and medication is effective and I am under a medical doctor's
> care . . ., however my condition which is a DISABILITY does require
> support, understanding and people around me that are willing to help and
> assist me and not people that stigmatize, generalize, judge or discriminate
> against me.   I certainly appreciate any consideration and accommodation
> U.S. Bank has shown me so far but do think based on my manager[']s write
> up dated Aug[ust] 6 and the information contained therein, and the continued
> discrimination and stigma that I have faced[,] that there is more work to be
> done by U.S. Bank in regard to this.

(Id.)

Upon receiving this response, Yoch determined that Weesner's complaints of

---

[6] The warning, dated August 6, was not delivered until August 12.

discrimination required follow up, and she scheduled a meeting with him on August 21, 2009.   (Yoch Dep. at 106.)   She asked another HR employee, Nathan Pommeranz, to attend and take notes; Pommeranz had never met Weesner and had learned his name only a week or two earlier.   (Id.; Pommeranz Dep. at 15-17.)

At the meeting, Yoch asked Weesner to describe the discrimination he believed he had experienced.   (May Aff. Ex. 27.)[7]   Weesner, however, only wanted to discuss Criego's written warning (and Macdonald's prior one).   (See id. at 6-24.)   He accused Yoch of being biased and always accepting others' versions of events without investigating.   (Id. at 10-11, 23-24.)   He further accused her of failing to review his file before the meeting and "perceiving" things incorrectly.   (Id. at 13, 22.)   By his own reckoning, his questions were pointed and direct (Weesner Dep. at 203); the recording of the conversation clearly reveals that Weesner was agitated and argumentative, although he did not yell.   (See May Aff. Ex. 28; see also Yoch Dep. at 123; Pommeranz Dep. at 20-21.) Yoch and Pommeranz assert that Weesner repeatedly reached across the table and pointed his finger in Yoch's face, a contention Weesner disputes.   (Weesner Dep. at 204-05; Yoch Dep. at 123; Pommeranz Dep. at 21.)   They also assert that Weesner assumed a "forceful" and "aggressive" posture, such as "leaning back in his chair [and then] sitting up abruptly," making "animated" hand gestures, and "physically shaking" in his chair.   (Pommeranz Dep. at 21; Yoch Dep. at 123-24.)   Weesner labels these claims "complete fabrication." (Weesner Dep. at 205.)

---

[7] Exhibit 27 is a transcript of the meeting produced from a surreptitious recording Weesner made. Exhibit 28 is a copy of the recording, which Weesner submitted to the Court on compact disc.

Regardless, Yoch and Pommeranz *perceived* Weesner's conduct in the meeting as "hostile," "intimidating," "aggressive," and "scary."   (Yoch Dep. at 123, 136; Pommeranz Dep. at 30, 35.)   Yoch grew concerned that the meeting could turn physical.   (Yoch Dep. at 136 (noting she was afraid "that [she] was going to get hit").)   Pommeranz, too, thought it possible that Weesner might strike Yoch.   (Pommeranz Dep. at 36.)   Yoch was so concerned for her safety that she asked corporate security to escort her to her car at the end of the day.   (Yoch Dep. at 130.)

After the meeting, Pommeranz and Yoch separately spoke with Anthonsen, although there is some dispute in which order those conversations occurred.   (Anthonsen Dep. at 71-72; Pommeranz Dep. at 35; Yoch Dep. at 128.)   Yoch cried and related that she was "scared" by Weesner's behavior.   (Anthonsen Dep. at 71.)   Pommeranz indicated that the meeting had made him feel "uncomfortable."   (Id. at 72; Pommeranz Dep. at 35.) Anthonsen then spoke with her supervisor, members of U.S. Bank's legal staff, and Ragan (who was on vacation).   (Anthonsen Dep. at 72-75.)   Ragan, in turn, spoke with Yoch and Pommeranz and, after learning that Yoch had feared for her safety in the meeting, concluded that Weesner's employment should be terminated because of a "clear violation of [U.S. Bank's] code of ethics policies and appropriate conduct in the workplace." (Ragan Dep. at 49-50; Anthonsen Dep. at 86.)[8]

Because Ragan was on vacation, she asked HR to contact Ulrich (her supervisor) to

---

[8]  In his deposition, Pommeranz did not recall speaking to Ragan about the incident (Pommeranz Dep. at 40), although Ragan testified that she "talked to the people that were involved" (Ragan Dep. at 50).   Weesner does not dispute that Ragan "talked to Yoch and Pommeranz about the incident [and] also spoke with Cathy Anthonsen and others."   (Mem. in Opp'n at 17.)

inform Weesner that he had been terminated.   (Ragan Dep. at 50-51.)   Ulrich called

Weesner during the evening of August 21, 2009 (the same day of the meeting); when he

told Weesner he was being terminated due to "threatening" behavior, Weesner expressed

surprise and said that he had "no idea what [Ulrich] was referring to."   (Ulrich Dep. at 13;

accord Weesner Dep. at 207-08.)   He also denied any inappropriate behavior in the

meeting.   (May Aff. Ex. 29.)   Ulrich, who had not been privy to the conversations among

Yoch, Pommeranz, and Ragan, thought it "fair to go back and have a follow-up

conversation with HR," and he relayed to Weesner that he would "wait" before making a

final termination decision.   (Ulrich Dep. at 15; May Aff. Ex. 29.)   Ulrich then spoke with

Ragan, Yoch, Macdonald, Criego, and Cindy Nihart, another U.S. Bank HR employee, and

affirmed the decision to terminate Weesner's employment; his employment was

terminated on August 25, 2009.   (Ulrich Dep. at 16; May Aff. Ex. 29.)

    After exhausting administrative remedies, Weesner commenced the instant action,

alleging that U.S. Bank discriminated against him on account of his mental disabilities in

violation of the ADA and MHRA and retaliated against him in violation of the MHRA.[9]

With discovery complete, U.S. Bank now moves for summary judgment.   The Court held

oral argument on the Motion on July 26, 2011, and it is now ripe for disposition.

_____

[9]  The MHRA uses the term "reprisal" rather than "retaliation," but MHRA reprisal claims are
analyzed in the same fashion as retaliation claims under federal employment statutes such as the
ADA.   E.g., Colenburg v. STARCON Int'l, Inc., 656 F. Supp. 2d 947, 956 n.7 (D. Minn. 2009)
(Kyle, J.), aff'd, 619 F.3d 986 (8th Cir. 2010).   The Court uses the latter term herein.

# STANDARD OF DECISION

Summary judgment is proper if, drawing all reasonable inferences in favor of the nonmoving party, there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of showing that the material facts in the case are undisputed. Id. at 322; Whisenhunt v. Sw. Bell Tel., 573 F.3d 565, 568 (8th Cir. 2009). The Court must view the evidence, and the inferences that may be reasonably drawn from it, in the light most favorable to the nonmoving party. Weitz Co., LLC v. Lloyd's of London, 574 F.3d 885, 892 (8th Cir. 2009); Carraher v. Target Corp., 503 F.3d 714, 716 (8th Cir. 2007). The nonmoving party may not rest on mere allegations or denials, but must show through the presentation of admissible evidence that specific facts exist creating a genuine issue of material fact for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); Wingate v. Gage Cnty. Sch. Dist., No. 34, 528 F.3d 1074, 1078-79 (8th Cir. 2008). As the Eighth Circuit recently clarified, summary judgment is just as appropriate in a discrimination case as any other case in which there exists no genuine issue of material fact. Torgerson v. City of Rochester, __ F.3d __, 2011 WL 2135636, at *8 (8th Cir. 2011) (*en banc*) ("There is no 'discrimination case exception' to the application of summary judgment.").[10]

---

[10] As a result of Torgerson, numerous prior Eighth Circuit cases have been abrogated in part on this point of law and are designated with a "red flag" by Westlaw. When the Court cites such cases for other legal principles that remain good law, however, it will not pause to indicate their abrogation on other grounds.

**ANALYSIS**

Weesner asserts that U.S. Bank discriminated against him by (1) failing to reasonably accommodate his disability (paranoid schizophrenia) and (2) terminating his employment because of that disability.   He also asserts that U.S. Bank retaliated against him for complaining of discrimination.   The Court begins its analysis with the failure-to-accommodate claim and then proceeds to the discriminatory-discharge/ retaliation claims, which it considers together.   Ultimately, none of Weesner's claims survives summary judgment.

## I.   The failure-to-accommodate claim[11]

The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."   42 U.S.C. § 12112(a).   Discrimination under the statute includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability."   Id. § 12112(b)(5)(A).   A plaintiff alleging a failure to accommodate "bears the initial burden of demonstrating that he requested reasonable accommodations."   Mershon v. St. Louis Univ., 442 F.3d 1069, 1077 (8th Cir. 2006) (citing U.S. Airways, Inc. v. Barnett, 535 U.S. 391, 401-02 (2002)).   "[I]f a requested accommodation is unreasonable, then the

---

[11]  Weesner asserts that U.S. Bank's failure to accommodate his paranoid schizophrenia violated both the ADA and the MHRA.   These claims are analyzed under the same standard.   See, e.g., Loye v. Cnty. of Dakota, 625 F.3d 494, 496 n.2 (8th Cir. 2010); Kobus v. Coll. of St. Scholastica, Inc., 608 F.3d 1034, 1038 (8th Cir. 2010).

employee has not shown 'discrimination.'"   Peebles v. Potter, 354 F.3d 761, 767 n.6 (8th Cir. 2004).

> As relevant to this case, the ADA defines "reasonable accommodation" as:
>
> Job restructuring, part-time or modified work schedules, reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies, the provision of qualified readers or interpreters, and other similar accommodations for individuals with disabilities.

42 U.S.C. § 12111(9)(B); see also 29 C.F.R. § 1630.2(o).   The so-called "reasonable accommodation" Weesner identifies here is the opportunity to "take an elevated conversation to HR so he [could] properly address the substance of [his] supervisor's communication."   (Mem. in Opp'n at 40.)   U.S. Bank argues, *inter alia*, that such an accommodation is unreasonable as a matter of law.   (Def. Mem. at 19-20.)   The Court agrees.[12]

The problem with Weesner's proposed accommodation is its amorphous nature. Weesner claims he should have been permitted to take "heightened" or "elevated"

---

[12] Weesner relies upon EEOC v. Convergys Customer Management Group, Inc., 491 F.3d 790, 796 (8th Cir. 2007), to argue that "[w]hether an accommodation is reasonable is a question of fact to be decided by a jury."   (Mem. in Opp'n at 39.)   Convergys cited Fjellestad v. Pizza Hut of America, Inc., 188 F.3d 944, 957 (8th Cir. 1999), for this proposition.   See 491 F.3d at 796.   But Fjellestad did not lay down a blanket rule requiring a jury to determine whether any proposed accommodation is reasonable.   Rather, it found *on the facts of that case* that the plaintiff had presented sufficient evidence to create a genuine issue on the reasonable-accommodation question. 188 F.3d at 957.   The Eighth Circuit has repeatedly found accommodations proffered by plaintiffs to be unreasonable as a matter of law, both before and after Convergys.   See, e.g., Brannon v. Luco Mop Co., 521 F.3d 843, 849 (8th Cir. 2008); Rask v. Fresenius Med. Care N. Am., 509 F.3d 466, 470-71 (8th Cir. 2007); Peebles, 354 F.3d at 769; Pickens v. Soo Line R.R. Co., 264 F.3d 773, 778 (8th Cir. 2001); Mole v. Buckhorn Rubber Prods., Inc., 165 F.3d 1212, 1218 (8th Cir. 1999). Decisions of other courts are in accord.   See, e.g., Jovanovic v. In-Sink-Erator Div. of Emerson Elec. Co., 201 F.3d 894, 900 n.9 (7th Cir. 2000); Gaul v. Lucent Techs., Inc., 134 F.3d 576, 581 (3d Cir. 1998).   Accordingly, it is this Court's view that Convergys does not preclude it from determining that Weesner's proposed accommodation is unreasonable as a matter of law.

conversations to HR.   (Mem. in Opp'n at 39; see also Weesner Dep. at 143-45.)   But what

is a "heightened" or "elevated" conversation?   Is a conversation "elevated" to Weesner

necessarily "elevated" to one of his supervisors?   In the Court's view, such a vague and

ambiguous accommodation request is inherently unworkable and, hence, unreasonable.

See, e.g., Wallin v. Minn. Dep't of Corr., 153 F.3d 681, 689 (8th Cir. 1998) (citing Gaul v.

Lucent Techs., Inc., 134 F.3d 576 (3d Cir. 1998), for the proposition that an employee's

"amorphous" accommodation request was "unreasonable as a matter of law"); Olson v.

Dubuque Cmty. Sch. Dist., 137 F.3d 609, 612-13 (8th Cir. 1998) (Sachs, D.J., sitting by

designation, concurring) (same); Vandeveer v. Fort James Corp., 192 F. Supp. 2d 918, 940

(E.D. Wis. 2002) ("Asking an employer to reduce the stress of the workplace is an

ambiguous . . . goal, and is not a reasonable accommodation.").

Notably, Weesner seems to recognize the imprecise nature of his proposed

accommodation.   He points out that raising one's voice and becoming agitated are mere

examples of "heightened" or "elevated" conversations, but he offers no additional detail as

to what other conduct might fall within these definitions.   (Mem. in Opp'n at 39.)   In fact,

it appears that he wanted HR involved any time he perceived his supervisors to be acting

"unprofessionally."   (See Weesner Dep. Ex. 14 (asserting "I have the right to be treated in

a professional and courteous manner" and "if an exchange has become unprofessional, I

will request the immediate intervention of HR"); May Aff. Ex. 23 at 34-35 (indicating

Weesner sought HR intervention when he thought Criego used an "unprofessional" tone of

voice); Weesner Dep. Ex. 21 (asserting that he had the "basic human right to end

participation in [an] unprofessional exchange").)   Such inherently subjective complaints

do not fall within the ADA's ambit.   See, e.g., United States v. AMC Entm't, Inc., 549

F.3d 760, 773 (9th Cir. 2008) (declining to find ADA violation "based upon the subjective

and undoubtedly diverse" perspectives of plaintiffs) (quoting Lara v. Cinemark USA, Inc.,

207 F.3d 783, 789 (5th Cir. 2000)); Gittings v. Tredegar Corp., No. 08 C 4972, 2010 WL

4930998, at *7 (N.D. Ill. Nov. 29, 2010) ("Purely subjective characterizations of a facial

expression and an ensuing 'cold shoulder' do not an ADA discrimination claim make.").

Simply put, "legislation such as the ADA cannot regulate individuals' conduct so as to

ensure that they will never be rude or insensitive."   Camarillo v. Carrols Corp., 518 F.3d

153, 157 (2d Cir. 2008) (*per curiam*).

Moreover, Weesner's proposed accommodation would, in essence, transform U.S.

Bank's HR department into his personal mediator, requiring it to intercede, without

advance notice, whenever he perceived a conversation to be "elevated" or "heightened."

As the Third Circuit noted in Gaul, such a "proposed accommodation would impose a

wholly impractical obligation on . . . any employer" and would be "subject to tremendous

abuse."   134 F.3d at 581.   Workplaces often are fraught with stress and supervisors

sometimes yell or raise their voices at subordinates, but the employment-

discrimination laws do not prevent them from doing so.   See, e.g., Shaver v. Indep. Stave

Co., 350 F.3d 716, 721 (8th Cir. 2003) ("Conduct that is merely rude, abrasive, unkind, or

insensitive does not come within the scope of the [ADA]."); Wallin, 153 F.3d at 688

("[T]he discrimination laws are not a 'general civility code.'") (citation omitted); Mayers

v. Laborers' Health & Safety Fund of N. Am., 404 F. Supp. 2d 59, 62 (D.D.C. 2005) ("The

ADA . . . does not guarantee an employee a comfortable work environment.") (emphasis

deleted).   The Court simply does not believe that the ADA (or the MHRA) required U.S.

Bank to undertake the "extraordinary administrative burdens" the proposed

accommodation here would engender.   Gaul, 134 F.3d at 581; see also Cannice v.

Norwest Bank Iowa N.A., 189 F.3d 723, 728 (8th Cir. 1999) ("We do not believe . . . that

the obligation to make reasonable accommodation extends to providing an

aggravation-free environment.").

    Weesner argues that the reasonableness of his proposed accommodation is

evidenced by the fact that it "mirrors" U.S. Bank's "open communication policy."   (Mem.

in Opp'n at 40.)   That policy provides, in part, that HR personnel are "available to assist

[employees] in resolving or escalating [an employee's] concerns" regarding "work

responsibilities, environment, disciplinary actions," and the like.   (May Aff. Ex. 10.)   But

nothing in this policy suggests that it can be invoked by an employee at a moment's notice,

unlike the proposed accommodation Weesner proffers here.   Nor does the Court believe

that the policy on its face applies, or was intended to apply, to every disagreement between

a supervisor and a subordinate; indeed, if that were the case there would have been no need

for Weesner to request an accommodation at all, as the policy would have already

permitted him to seek HR assistance with "elevated" conversations.   Weesner also asserts

that his proposed accommodation is reasonable because it is consistent with guidance from

the Equal Employment Opportunity Commission, which provides that "it may be

reasonable to . . . adjust supervisory methods by, for example, communicating in the

*medium* most effective for a particular individual."   (Mem. in Opp'n at 40 (citing Equal

Employment Opportunity Commission Enforcement Guidance on the Americans with

Disabilities Act and Psychiatric Disabilities, No. 915.002 (Mar. 25, 1997) (emphasis added), available at http://www.eeoc.gov/policy/docs/psych.html).)   As the emphasized portion above makes clear, however, the EEOC's guidance concerns the most effective *modes* of communication, *i.e.*, "in writing, in conversation, or by electronic mail," something not at issue here.[13]

The Court determines, as a matter of law, that the proposed accommodation was unreasonable.   Accordingly, Weesner's failure-to-accommodate claim must be dismissed.

## II.    The claims based on Weesner's termination

In his remaining claims, Weesner asserts that U.S. Bank terminated his employment (1) because he suffers from a disability and (2) in retaliation for complaining about discrimination.   The parties agree that these claims must be analyzed under the tripartite burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).   (See Def. Mem. at 18, 31; Mem. in Opp'n at 20, 44-45.)   The first step of McDonnell Douglas requires Weesner to establish a prima facie case.   To establish a prima facie case of *discrimination*, a plaintiff must show that he (1) has a disability within the meaning of the ADA, (2) is qualified to perform the essential functions of the job, with or without reasonable accommodation, and (3) suffered an adverse employment action due to a disability.   E.g., Chalfant v. Titan Distrib., Inc., 475 F.3d 982, 988 (8th Cir. 2007) (internal quotations and citation omitted); Wenzel v. Mo.-Am. Water Co., 404 F.3d 1038,

---

[13]  At oral argument, Weesner asserted that his proposed accommodation was reasonable because it was suggested by Anthonsen.   But an "accommodation is not reasonable simply because" it is offered by the employer and "fulfills the employee's request" for accommodation.   Feliberty v. Kemper Corp., 98 F.3d 274, 280 (7th Cir. 1996).

1040 (8th Cir. 2005).   To establish a prima facie case of *retaliation*, a plaintiff must show

that (1) he engaged in protected conduct, (2) he suffered a materially adverse employment

action, and (3) the materially adverse action was causally linked to the protected conduct.

E.g., Fercello v. Cnty. of Ramsey, 612 F.3d 1069, 1077-78 (8th Cir. 2010).   If a plaintiff

establishes a prima facie case, the burden shifts to the defendant to proffer a legitimate,

non-discriminatory (or non-retaliatory) reason for its action.   E.g., Kratzer v. Rockwell

Collins, Inc., 398 F.3d 1040, 1044 (8th Cir. 2005).   If it does so, the burden then shifts

back to the plaintiff "to put forth evidence of pretext, the ultimate question being whether a

'prohibited reason, rather than the proffered reason, actually motivated the employer's

action.'"   Fercello, 612 F.3d at 1078 (quoting Wallace v. DTG Operations, Inc., 442 F.3d

1112, 1120 (8th Cir. 2006)).

Here, the parties devote substantial portions of their briefs to whether Weesner can

establish a prima facie case of either discrimination or retaliation.   (See Def. Mem. at

21-25, 29-31; Mem. in Opp'n at 21-29, 44-46.)   Yet, when an employer has proffered a

legitimate, non-discriminatory (or non-retaliatory) reason, the Court may skip the prima

facie case and move directly to McDonnell Douglas's final step (pretext).   E.g., U.S.

Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 715 (1983); McCullough v. Univ.

of Ark. for Med. Scis., 559 F.3d 855, 861 (8th Cir. 2009).   U.S. Bank has proffered such a

reason here:   Weesner's (mis)conduct at the August 21, 2009, meeting with Yoch and

Pommeranz.   Hence, the Court proceeds to the question of pretext.

Weesner can demonstrate pretext by (1) "show[ing] that [U.S. Bank's] explanation

[for his termination] is unworthy of credence . . . because it has no basis in fact" or

(2) "persuading the court that a [prohibited] reason more likely motivated [U.S. Bank]."

Torgerson, __ F.3d __, 2011 WL 2135636, at *12.   "Either route amounts to showing that

a prohibited reason, rather than the employer's stated reason, actually motivated the

employer's action."   Id.   In the Court's view, Weesner has not, and cannot, create a

genuine issue as to whether U.S. Bank's given reason for his termination was pretextual.

### A.   Good-faith belief and Pye

The crux of Weesner's argument is his dispute over his conduct at the August 21

meeting.   He "adamantly denies that he ever reached across the table or pointed his finger

at Yoch or engaged in any inappropriate conduct," and he "completely disagrees with

Yoch's characterization of his behavior in the meeting."   (Mem. in Opp'n at 16.)   He

argues, therefore, that "[s]ummary judgment is precluded because there is a genuine issue

of material fact as to whether [he] actually committed the alleged misconduct that

supposedly led to his termination."   (Id. at 30.)   This argument misapprehends the

dispositive issue.

"The critical inquiry in discrimination cases like this one is not whether the

employee actually engaged in the conduct for which he was terminated, but whether the

employer in good faith *believed* that the employee was guilty of the conduct justifying

discharge."   McCullough, 559 F.3d at 861-62 (emphasis added); accord, e.g., Twymon v.

Wells Fargo & Co., 462 F.3d 925, 935 (8th Cir. 2006) ("A proffered legitimate,

non-discriminatory reason for termination need not, in the end, be correct if the employer

honestly believed the asserted grounds at the time of the termination.").   No claim will lie

when an employer discharges an employee based on a good-faith belief that he engaged in

misconduct, because in such a situation "the employer has acted because of perceived

misconduct, not because of protected status or activity."   Chivers v. Wal-Mart Stores, Inc.,

641 F.3d 927, 934 (8th Cir. 2011) (quoting Richey v. City of Independence, 540 F.3d 779,

784 (8th Cir. 2008)).

Weesner contends that the good-faith belief rule cannot apply here, relying upon the

Eighth Circuit's recent decision in Pye v. Nu Aire, Inc., 641 F.3d 1011 (8th Cir. 2011).

(Mem. in Opp'n at 31.)   There, Pye had complained about discrimination by a co-worker

and Nu Aire's HR director conducted an investigation, including meeting with Pye and his

supervisor.   What occurred at this meeting was hotly contested by the parties; the HR

director contended that Pye "was shaking . . . down" Nu Aire for a promotion, money, and

a company car, while Pye claimed that those items had only been suggested by his

supervisor after asking what he "wanted to make the problem go away."   Id. at 1016.   Pye

was fired after the HR director reported the attempted "shake down" to upper management,

and Pye sued, alleging that Nu Aire had discriminated and retaliated against him.   The

district court granted Nu Aire's motion for summary judgment because, among other

reasons, Pye had failed to create a genuine issue regarding Nu Aire's good-faith belief that

his conduct was improper.   Id. at 1017.

The Eighth Circuit reversed this portion of the district court's order.   It held that if

Pye's version of events were accepted as true, he had simply offered possible "remedies"

for Nu Aire's discrimination.   Hence, crediting his testimony, the allegedly improper

comments were "inextricably intertwined with" protected conduct and, accordingly, could

not lawfully serve as the basis for his termination.   Id. at 1020-21.

Weesner argues that, "[a]s in <u>Pye</u>, the August 21 meeting was called to discuss [his] allegations of discrimination," and "the alleged misconduct occurred while [he] provided additional information about the discrimination."   (Mem. in Opp'n at 31.)   Accordingly, he claims that the good-faith belief rule is inapplicable because "the reason given for [his] termination is inextricably intertwined with his reports of discrimination and retaliation." (<u>Id.</u>)   This argument, however, misconstrues the limited nature of the holding in <u>Pye</u>.

This Court does not read <u>Pye</u> as laying down a *per se* rule prohibiting an employer from firing an employee for any misconduct "inextricably intertwined" with a complaint of discrimination.   Such a rule would make little sense.   Imagine, for example, that an employee punched a co-worker while in a meeting to discuss allegations of discrimination. Even though, as Weesner argues here, such misconduct would have "occurred while [the employee was] provid[ing] additional information about the discrimination," the employee would not be protected from termination.   <u>See, e.g.</u>, <u>Alvarez v. Des Moines Bolt Supply, Inc.</u>, 626 F.3d 410, 417 (8th Cir. 2010) ("Filing a harassment complaint . . . does not insulate an employee from the consequences of violating company policy."); <u>Richey</u>, 540 F.3d at 784 (same); <u>Green v. Franklin Nat'l Bank of Minneapolis</u>, 459 F.3d 903, 915 (8th Cir. 2006) (noting that a plaintiff can "turn[] his protected activity into unprotected activity by being rude and disruptive to the work environment"); <u>Gilooly v. Mo. Dep't of Health & Senior Servs.</u>, 421 F.3d 734, 740 (8th Cir. 2005) ("[I]t cannot be true that a plaintiff can file false charges, lie to an investigator, and possibly defame co-employees, without suffering repercussions simply because the investigation was about sexual harassment.").   Indeed, the *en banc* Eighth Circuit held in <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1136 (8th

Cir. 1999), that "[a]lthough contesting an unlawful employment practice is protected conduct, the anti-discrimination statutes do not insulate an employee from discipline for violating the employer's rules or disrupting the workplace." And the improper conduct at issue in Kiel – yelling at a supervisor, calling her "selfish," and slamming a desk drawer – occurred while the plaintiff was engaged in protected conduct, namely, requesting accommodation for his disabilities. Id. at 1134.

Regardless, Pye is distinguishable on its "unique" facts. 641 F.3d at 1023. The problem in that case was, accepting as true Pye's version of events, the alleged impropriety – a request for a car, a promotion, and more money – was *itself* "protected conduct." See id. at 1020 ("Accepting Pye's version of what was said . . ., his comments at the meeting would . . . have been protected conduct."). This is because, under Pye's account of the meeting, he had merely suggested possible *remedies* for unlawful discrimination. Id. at 1021 ("[V]iewed in the light most favorable to Pye, the evidence shows that his termination was a direct result of his complaint of discrimination *and his suggestions of remedies*, prompted by the investigator's questions."). If an employee's comments amount to protected conduct, they cannot serve as the basis for his discharge, lest his employer engage in retaliation. Here, by contrast, U.S. Bank does not claim it terminated Weesner's employment because of *what* he said. Rather, the misconduct was *how* he said it. Hence, the proffered basis for his termination was not itself protected conduct and does not fall within Pye.[14]

---

[14] Moreover, Pye found (in part) a genuine issue for trial because there was "no evidence that Nu Aire had any concerns regarding Pye's performance before he engaged in protected conduct."

Based on the foregoing, the Court concludes that the good-faith belief rule applies here.

**B.      There is no genuine issue regarding U.S. Bank's good-faith belief**

The foregoing does not end the inquiry.   Even though the good-faith belief rule is applicable, Weesner can survive summary judgment by creating a genuine issue that U.S. Bank "acted based on an intent to retaliate [or discriminate] rather than on a good faith belief that [he] violated a workplace rule."   <u>McCullough</u>, 559 F.3d at 864 (quoting <u>Richey</u>, 540 F.3d at 785).   Weesner attempts, unsuccessfully, to make such a showing.

Weesner first argues that Ragan did not conduct a thorough investigation or speak with him before deciding to terminate his employment.   (Mem. in Opp'n at 34.)   Putting aside that "shortcomings in an investigation do not by themselves support an inference of discrimination," <u>Wierman v. Casey's Gen. Stores</u>, 638 F.3d 984, 997 (8th Cir. 2011), there is simply no support in the record for the contention that Ragan failed to properly investigate.   It is undisputed that she spoke with Yoch, Pommeranz, Anthonsen, and others before making the decision to terminate Weesner's employment.   Importantly, Ragan's decision was not based solely on Yoch's view of Weesner's conduct – *Pommeranz*, who had not met Weesner before the day in question, corroborated that Weesner had acted in an "intimidating" and "aggressive" fashion in the August 21 meeting.[15]

---

641 F.3d at 1021.   Here, Weesner had a long and documented history of communication problems with his co-workers and superiors.

[15] Notably, this undermines Weesner's reliance on <u>Richey</u> for the proposition that "when an

Weesner apparently believes that U.S. Bank's failure to get his side of the story before terminating his employment indicates that the investigation was not thorough and, accordingly, suggests pretext.   (See Mem. in Opp'n at 33.)   Yet, he has cited no judicial authority providing that an employer is required to interview an employee about alleged misconduct before termination, and indeed case law suggests just the opposite.   See, e.g., Wierman, 638 F.3d at 996-97; Cooper v. Wal-Mart Stores, Inc., 296 F. App'x 686, 696 (10th Cir. 2008); Martin v. Health Care & Retirement Corp., 67 F. App'x 109, 112-13 (3d Cir. 2003); Macon v. Kings Family Restaurant, Civ. A. No. 06-300, 2007 WL 1366789, at *7 (W.D. Pa. May 7, 2007).   "The appropriate scope of investigation is a business judgment," and an employer "can certainly choose how to . . . handl[e] claims of discrimination, as long as it does not discriminate in doing so."   McCullough, 559 F.3d at 863.   In addition, Weesner has pointed to no evidence indicating that the failure to interview him violated a U.S. Bank policy or procedure, cf. Cooper, 296 F. App'x at 696 (failure to comply with internal policy requiring all investigations to seek out accused employee's side of the story could suggest pretext), or that other employees engaging in similar misconduct were treated differently, see Chivers, 641 F.3d at 935.

In any event, Weesner's argument ignores that it was *Ulrich* (Ragan's supervisor)

employer is presented with a 'he said, she said' set of facts involving two employees, and the employer chooses to disbelieve and discipline the employee who had engaged in protected [conduct], then the employee's claim . . . must go to a jury."   540 F.3d at 785.   Ragan was not presented with two conflicting views, one Weesner's and one Yoch's.   Rather, she received independent corroboration of Yoch from Pommeranz.   Weesner seems to recognize this problem in his brief, as he repeatedly attempts to lump Pommeranz together with Yoch, asserting that Pommeranz must have been biased simply because Yoch (supposedly) was.   But he has proffered no evidence indicating, or even suggesting, any reason for Pommeranz to be biased against him or any evidence supporting that claimed "bias."

and not Ragan who made the ultimate decision to terminate his employment.   Weesner
expressed surprise after being told that he was being fired and disputed Yoch's and
Pommeranz's characterization of his conduct.   In response, Ulrich put the termination on
hold and then re-investigated, speaking with Ragan, Yoch, and others.   Only after that
investigation was the decision to terminate his employment finalized.   Hence, there is no
support for the contention that Weesner was deprived of an opportunity to tell his side of
the story before being terminated – Ulrich was well aware that he disputed Yoch's and
Pommeranz's version of events.

Weesner also assails U.S. Bank's decision because it was based on "the unverifiable
statements of Yoch and Pommeranz."   (Mem. in Opp'n at 33.)   But carrying this
argument to its logical conclusion would mean that no employer could fire an employee for
misconduct occurring outside a supervisor's presence.   The law requires no such thing.
An employer assessing "allegations of workplace misconduct is entitled to latitude in
evaluating the information gathered," Alvarez, 626 F.3d at 417, and may decide which
witnesses to believe or disbelieve, as long as it makes an "honest choice" between
conflicting accounts, Gilooly, 421 F.3d at 743 (Colloton, J., concurring and dissenting)
(citation omitted), and reaches a "reasonably informed and considered decision," Chivers,
641 F.3d at 934 n.6.   As the Supreme Court noted in Waters v. Churchill, 511 U.S. 661,
676 (1994), "employers . . . often do rely on hearsay, on past similar conduct, on their
personal knowledge of people's credibility, and on other factors that the judicial process
ignores.   Such reliance may sometimes be the most effective way for the employer to
avoid future recurrences of improper and disruptive conduct."

Weesner also points to the temporal proximity between his discrimination complaint and his termination in an attempt to show retaliation was U.S. Bank's true motive.  (Mem. in Opp'n at 35-36.)   As he acknowledges, however, timing alone rarely suffices to prove retaliatory intent.   E.g., Green, 459 F.3d at 916; Kiel, 169 F.3d at 1136 ("Generally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation."). Moreover, any causal link between his complaint and his termination is eroded by his intervening conduct at the August 21 meeting, which "gives an explanation for the temporal proximity other than a discriminatory motive."   Wierman, 638 F.3d at 998; accord, e.g., Cheshewalla v. Rand & Son Constr. Co., 415 F.3d 847, 852 (8th Cir. 2005). More importantly, Weesner had a long history of problems interacting and communicating with his co-workers.   And it was exactly this type of behavior that, according to U.S. Bank, resulted in the termination of his employment.   "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."   Smith v. Allen Health Sys., Inc., 302 F.3d 827, 834 (8th Cir. 2002); accord, e.g., Hervey v. Cnty. of Koochiching, 527 F.3d 711, 723 (8th Cir. 2008); Smith v. Ashland, Inc., 250 F.3d 1167, 1174 (8th Cir. 2001).

Simply put, "the ADA does not insulate emotional or violent outbursts," Hamilton v. Sw. Bell Tel. Co., 136 F.3d 1047, 1052 (5th Cir. 1998), and is not "a license for insubordination at the workplace," Reed v. LePage Bakeries, Inc., 244 F.3d 254, 262 (1st Cir. 2001).   Here, the record supports U.S. Bank's assertion that it terminated Weesner because of its good-faith belief that he had engaged in intimidating and aggressive

behavior, and Weesner has failed to create a genuine issue to the contrary.   His claims based on his termination, therefore, must fail.

## CONCLUSION

Based on the foregoing, and all the files, records, and proceedings herein, **IT IS ORDERED** that U.S. Bank's Motion for Summary Judgment (Doc. No. 24) is **GRANTED** and Weesner's Amended Complaint (Doc. No. 3) is **DISMISSED WITH PREJUDICE.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: August 10, 2011

s/Richard H. Kyle
RICHARD H. KYLE
United States District Judge